UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

|  |  |  |
|---|---|---|
| ALEJANDRO YEATTS, | ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | No.  3:16-cv-706 |
| ZIMMER BIOMET HOLDINGS, INC., | ) ) | JURY TRIAL DEMANDED |
| *Defendant.* | ) ) ) ) ) | |

**COMPLAINT**

This is an action for damages for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress, brought by Plaintiff Alejandro Yeatts against Zimmer Biomet Holdings, Inc. ("Zimmer Biomet").  On or about October 24, 2014, Zimmer Biomet published a false statement regarding Plaintiff, damaging his reputation, inflicting severe emotional distress, and causing monetary and other damages.

**I.  PARTIES**

1.      Plaintiff Alejandro Yeatts is a resident of Argentina.  From 2005 until September 4, 2015, he was employed by Biomet Argentina, SA ("Biomet Argentina"), a subsidiary of the Defendant, Zimmer Biomet, or its predecessor, Biomet, Inc. ("Biomet").

2.      Defendant Zimmer Biomet is a Delaware corporation headquartered in Warsaw, Indiana, which manufactures and sells medical devices.  Zimmer Biomet was formed in 2015, when Zimmer Holdings, Inc., a Delaware corporation, acquired LVB Acquisition, Inc., a Delaware corporation that owned Biomet.

## II.    JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of a State and a citizen of a foreign state.

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## III.    FACTS

**A.    Plaintiff is Employed by Biomet Argentina, SA and Exposes Illegal Activity by the Company, Leading to an Internal Investigation**

5.       In April 2005, Plaintiff was hired as Managing Director of Biomet Argentina, SA.    Plaintiff moved his family from Costa Rica to Argentina in order to take the position.

6.      Several months after beginning his employment with Biomet Argentina, Plaintiff reported to the President of Biomet International, Ltd. ("Biomet International"), a subsidiary of Biomet, a number of ongoing improprieties by Biomet Argentina employees, including bookkeeping improprieties, forged FDA certificates, and sales of products without required authorization and registration.

7.      At a July 2007 Biomet sales meeting, Plaintiff attended a presentation by Biomet's Compliance Officer regarding the Foreign Corrupt Practices Act ("FCPA"). This was the first occasion on which Plaintiff was provided with training concerning the FCPA.  In her presentation, the Compliance Officer advised, *inter alia*, that doctors employed by any government could not be provided with money or other things of value in order to obtain business.    Following the presentation, Plaintiff informed the

Compliance Officer that, since before Plaintiff joined the company, Biomet Argentina employees had paid commissions to induce government-employed doctors to use Biomet products. The Compliance Officer advised Plaintiff that she would look into the matter and get back to Plaintiff.

8.     In March 2008, having heard nothing further from the Compliance Officer, Plaintiff approached an in-house attorney for Biomet International at a meeting of the American Academy of Orthopaedic Surgeons, and told her about the payments he had reported to the Compliance Officer.  The attorney said she would look into the matter and get back to Plaintiff.

9.     A year after Plaintiff first reported the violations, in August 2008, Plaintiff informed Will Boren, the President of Biomet International, of the ongoing payments he had reported to the Compliance Officer and the attorney, and expressed his concern over their legality.

10.     The concerns Plaintiff expressed led to an internal investigation, and in December 2008, Plaintiff was instructed to cease Biomet Argentina's payments to government-employed doctors.

B.     **Biomet International Creates a Sham Distribution System After Discovering That its Brazilian Distributor Engaged in Illegal Activity in Brazil in Connection with its Sale of Biomet Products**

11.     Until 2008, Biomet International sold medical devices in Brazil pursuant to a distribution agreement between Biomet International and Prosintese, a Brazilian company owned and operated by Sergio Galindo.   Prosintese made payments to doctors employed by the Brazilian government who used Biomet products.  However, in a May 2008 letter, Biomet General Counsel Bradley Tandy wrote Galindo (the "Termination Letter"), stating that because of information Biomet had learned regarding

Prosintese's business practices, the company was terminating its relationship with Prosintese. The Termination Agreement stated that Galindo and Prosintese would not be allowed to import, market, or sell Biomet products in Brazil.

12.     Brazilian law required that certain Biomet products be registered with the Brazilian government before they could be sold in that country, and Prosintese held the necessary registrations for Biomet products. Upon receipt of the Termination Letter, Galindo made clear to Biomet International that it would not be able to sell its products in Brazil without the necessary registrations, that it would require several years and more than $1 million to obtain new registrations, and that Galindo would not permit the company to continue to use Prosintese's registrations without compensation.

13.     Galindo and Biomet International entered into an agreement, pursuant to which Prosintese would retain the registrations necessary for Biomet International to sell Biomet products in Brazil, and until the company could obtain new registrations, Biomet products would be sold in Brazil through four new companies related to Prosintese. Boren negotiated this agreement for Biomet International, and Boren expected and intended that under it, Galindo would work directly with these new distributors. In-house counsel for Biomet participated in the negotiation of this agreement, and approved it.

14.     In May 2009, Biomet International entered into distribution agreements with the new companies.

**C.      Plaintiff Is Assigned Responsibility for Biomet's Operations in Brazil, After the Sham Distribution System Is Established.**

15.     Prior to September 2008, Plaintiff had had no involvement in Biomet International's operations in Brazil. However, on in September 2008, Boren wrote Plaintiff to inform him that Plaintiff would be offered the position of Managing Director

for South America, including Brazil, effective November 2008.  And in November 2008, Boren wrote to Plaintiff, stating that Plaintiff would become Business Manager for South America, including Brazil, in January 2009.

16.     Even though Boren had assigned ongoing responsibility for Brazil to Plaintiff, Plaintiff was given no information about the company's ongoing negotiations over the Termination Agreement with Prosintese and Galindo, or about the ongoing role Boren and the company intended them to have in Brazil.  In January 2009 email to Boren, Plaintiff asked Boren for clarification regarding Prosintese's ongoing role in Brazil, asking whether the company could, or could not, sell its products to Prosintese. In his response, Boren simply stated that he would handle matters concerning Brazil, and that any future inquiries concerning Brazil should come to his (Boren's) attention.

17.     Plaintiff understood, consistent with the Termination Letter, that Prosintese and Galindo were prohibited from selling Biomet products themselves in Brazil. However, Plaintiff was never told that Galindo and Prosintese were not to be involved with the new distributors, or that he should have no contact with Galindo or Prosintese.

18.     Plaintiff also understood that Galindo and Prosintese held the product registrations necessary to sell Biomet products in Brazil, and, consistent with Biomet International's expectations and plans, that Galindo was involved in the new distributors' importation of Biomet products.  With this understanding, Plaintiff continued to interact with Galindo, with the knowledge and approval of his superior, Boren, and company counsel.

**D.     Biomet Enters into a Deferred Prosecution Agreement, Falsely Leading the United States Government to Believe that the Company Has Severed Ties with Galindo and Prosintese**

19.    The internal investigation triggered by Plaintiff's disclosures of illegal activity led to negotiations between Biomet and the United States Department of Justice ("DOJ") over the resolution of possible criminal charges against the company, and its potential exclusion from participation in federal health care programs.   On March 26, 2012, Biomet and DOJ entered into a deferred prosecution agreement ("the DPA"), pursuant to which DOJ agreed to defer prosecution of a criminal information charging the company with five felonies, including violations of the FCPA based on improper payments made by the company to government-employed doctors in Argentina and Brazil.  Pursuant to the DPA, Biomet agreed to pay a criminal penalty of $17,280,000, to cooperate with law enforcement authorities in investigating violations of the FCPA, to implement and maintain a corporate compliance program, to engage an independent corporate compliance monitor, and to make periodic reports to DOJ regarding its corporate compliance program.

20.  In the DPA, Biomet admitted to having knowledge of Prosintese's payments to government-employed doctors in Brazil since at least 2001.  Biomet also admitted that between 2001 and 2008, Biomet International had authorized the payment of more than $1,000,000, "some or all of which" was used to bribe Brazilian doctors.

### E.  Biomet Falsely Blames Plaintiff for Its Breach of the Deferred Prosecution Agreement

21.  As described above, Galindo and Prosintese remained deeply involved in Biomet's Brazilian operations in the nearly four years between the Termination Letter and the company's entry into the DPA.  And as described above, Biomet International executives and legal counsel were well aware of that involvement.  Nevertheless, the DPA stated that ""[i]n or around May 2008, Biomet terminated its relationship" with Galindo and Prosintese.  Thus, it appears that Biomet was in breach of the DPA at the

moment it was signed in March 2012.

22.  When Biomet's breach of the DPA became known, the company dispatched an attorney to meet with Plaintiff.  In that meeting, Biomet's attorney accused Plaintiff of continuing to do business with Galindo following the Termination Letter, and of concealing this fact from his superiors.  Plaintiff explained that he was never instructed not to do business with Galindo or Prosintese, and that Boren had negotiated and established the new distribution system before Plaintiff assumed any responsibility for Biomet's Brazilian operations.

23.  In April 2014, Biomet Argentina suspended Plaintiff from his employment. He was later terminated.

**F.  Defendants Publish False and Defamatory Information Concerning Plaintiff**

24. On October 24, 2014, Antje Petersen-Schmalnauer, Chief Compliance Officer, Vice President and General Counsel of Biomet Inc. sent an email, addressed to "CPWAR DueDiligence (Mailbox)" and others, which informed its readers – falsely – that Plaintiff had engaged in criminal activity.  It stated, *inter alia*:

> Biomet Inc. and its worldwide subsidiaries ("Biomet" or the "Company") are committed to complying with the anti-corruption and anti-bribery laws in all countries in which Biomet operates.  In furtherance of that commitment, Biomet has identified several entities that pose significant and unacceptable compliance risks.  The Company has placed these entities on a Restricted Parties List.  All Biomet employees, agents, third parties, and any individual or entity performing services for or on behalf of Biomet, anywhere in the world may not do business with any entity on the Restricted Parties List.

The "Biomet, Inc. Restricted Parties List," which was attached to this email, included Plaintiff's name, and stated that Plaintiff had been "suspended in connection with corruption-related investigation involving Brazil."

25.  At the time this email was sent, it was widely known, within and without the

company, that an internal investigation of corruption in Brazil had been conducted, that the company had violated the FCPA in Brazil for many years, and had entered into a deferred prosecution agreement to avoid prosecution for this crime. The email's message – that Plaintiff had engaged in this criminal activity – was false, and defamatory *per se.* Furthermore, the Defendants were aware of its falsity at the time the email was published.

## COUNT ONE: DEFAMATION

25. Plaintiff realleges and incorporates herein by reference each allegation set forth in ¶¶ 1-24, *supra.*

26. The October 24, 2014, email was false, and defamed Plaintiff.

27. Defendant published the October 24, 2014, email,

28. Defendant published the October 24, 2014, email with malice, knowing that its statements regarding Plaintiff were false, or with reckless disregard of their falsity.

29. The publication of defamatory material in the October 24, 2014, email damaged Plaintiff's reputation for honesty, integrity, morality, and law-abidingness; exposed Plaintiff to harassment, public contempt, and ridicule; caused Plaintiff to lose professional stature; impaired his employment and earning opportunities for the rest of his life; and caused Plaintiff to suffer great pain and mental anguish.

WHEREFORE, Plaintiff demands judgment against Defendants for actual, general, special, and compensatory damages in an amount greater than $75,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable; and further demands judgment against Defendants for punitive damages.

## COUNT TWO: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

30. Plaintiff realleges and incorporates herein by reference each allegation set forth in ¶¶ 1-29, *supra*.

31. Defendants' conduct in knowingly publishing false information regarding Plaintiff in the October 24, 2014, email was extreme and outrageous.

32. Defendants published false information regarding Plaintiff in the October 24, 2014, email intentionally or recklessly.

33. As a result of Defendants extreme and outrageous conduct, Plaintiff suffered severe emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendants for actual, general, special, and compensatory damages in an amount greater than $75,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable; and further demands judgment against Defendants for punitive damages.

## COUNT THREE: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

34. Plaintiff realleges and incorporates herein by reference each allegation set forth in ¶¶ 1-33, *supra*.

35. Defendants' conduct in publishing false information regarding Plaintiff in the October 24, 2014, email was negligent.

36. As a result of Defendants' negligent conduct, Plaintiff suffered severe emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendants for actual, general, special, and compensatory damages in an amount greater than $75,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just

and equitable; and further demands judgment against Defendants for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and the following relief:

A.     That judgment be entered against Defendants for special damages, compensatory damages, and punitive damages in an an amount in excess of $75,000, exclusive of interest and costs;

B.     That all costs of this action be assessed against Defendants, including all reasonable attorney's fees, costs, and expenses of this action; and

C.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues properly triable by jury in this action.

Dated:   13 October 2016                    Respectfully submitted,

s/ Paul F. Enzinna
Paul F. Enzinna
Ellerman Enzinna
1050 W30th Street, NW
Washington, DC 20007
202.753.5553
penzinna@ellermanenzinna.com

s/ Matthew J. Anderson
Matthew J. Anderson
Anderson Agostino & Keller, P.C.
131 S. Taylor Street
South Bend, Indiana 46601
574.288.1510
mjanderson@aaklaw.com

*Counsel for Plaintiff Alejandro Yeatts*