UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| ALEJANDRO YEATTS, )<br>)<br>   *Plaintiff,* )<br>)<br> v. )<br>)<br>ZIMMER BIOMET HOLDINGS, INC., )<br>)<br>   *Defendant.* )<br>) | No.  3:16-cv-706<br><br>JURY TRIAL DEMANDED |

**AMENDED COMPLAINT**

   This is an action for damages for defamation, brought by Plaintiff Alejandro Yeatts against Zimmer Biomet Holdings, Inc. ("Zimmer Biomet").  Beginning on or about October 24, 2014, and on at least one occasion thereafter, Zimmer Biomet has intentionally published false statements regarding Plaintiff, damaging his reputation, inflicting severe emotional distress, and causing monetary and other damages.

**I.  PARTIES**

   1. Plaintiff Alejandro Yeatts is a resident of Argentina.  From 2005 until September 4, 2015, he was employed by Biomet Argentina, SA ("Biomet Argentina"), a subsidiary of the Defendant, Zimmer Biomet, or its predecessor, Biomet, Inc. ("Biomet").

   2. Defendant Zimmer Biomet is a Delaware corporation headquartered in Warsaw, Indiana, which manufactures and sells medical devices.  Zimmer Biomet was formed in 2015, when Zimmer Holdings, Inc., a Delaware corporation, acquired LVB Acquisition, Inc., a Delaware corporation that owned Biomet.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between a citizen of a State and a citizen of a foreign state.

4. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## III. FACTS

**A. Plaintiff is Employed by Biomet Argentina, SA and Exposes Illegal Activity by the Company, Leading to an Internal Investigation**

5. In April 2005, Plaintiff was hired as Managing Director of Biomet Argentina, SA. Plaintiff moved his family from Costa Rica to Argentina in order to take the position.

6. Several months after beginning his employment with Biomet Argentina, Plaintiff reported to his superior, the President of Biomet International (a subsidiary of Biomet), a number of ongoing improprieties by Biomet Argentina employees, including bookkeeping improprieties, forged FDA certificates, and sales of products without required authorization and registration.

7. At a July 2007 Biomet sales meeting, Plaintiff attended a presentation by Biomet's Compliance Officer regarding the Foreign Corrupt Practices Act ("FCPA"). This was the first occasion on which Plaintiff was provided with training concerning the FCPA. In her presentation, the Compliance Officer advised, *inter alia*, that doctors employed by any government could not be provided with money or other things of value in order to obtain business. Following the presentation, Plaintiff informed the Compliance Officer that, since before Plaintiff joined the company, Biomet Argentina employees had paid commissions to induce government-employed doctors to use Biomet products. The

2

Compliance Officer advised Plaintiff that she would look into the matter and get back to Plaintiff.

8. In March 2008, having heard nothing further from the Compliance Officer, Plaintiff approached an in-house attorney for Biomet International at a meeting of the American Academy of Orthopaedic Surgeons, and told her about the payments he had reported to the Compliance Officer. The attorney said she would look into the matter and get back to Plaintiff.

9. A year after Plaintiff first reported the violations, in August 2008, Plaintiff informed Wilber C. Boren, IV, the President of Biomet International ("Boren"), of the ongoing payments he had reported to the Compliance Officer and the attorney, and expressed his concern over their legality.

10. The concerns Plaintiff expressed led to an internal investigation, and in December 2008, Plaintiff was instructed to cease Biomet Argentina's payments to government-employed doctors.

**B. After Learning that its Brazilian Distributor Had Engaged in Illegal Conduct, Biomet Purports to "Terminate" the Distributor, But Creates a New Distribution System Using Nominee Distributors to Allow the Distributor to Continue to Sell Biomet Products in Brazil**

11. Until 2008, Biomet sold medical devices in Brazil pursuant to a distribution agreement between Biomet and Prosintese, a Brazilian company owned and operated by Sergio Galindo. However, Biomet learned, by early 2008 at the latest, that Prosintese had made illegal payments to doctors employed by the Brazilian government who used Biomet products. Therefore, in a May 2008 letter (the "Termination Letter"), Biomet General Counsel Bradley Tandy told Galindo that Biomet was terminating its relationship

3

with Prosintese because of information the company had learned regarding Prosintese's business practices. The Termination Letter stated that Galindo and Prosintese would not be allowed to import, market, or sell Biomet products in Brazil.

12. Brazilian law required that certain Biomet products be registered with the Brazilian government before they could be sold in that country, and Prosintese held the necessary registrations for Biomet products. Upon receipt of the Termination Letter, Galindo made clear to Biomet International that it would not be able to sell its products in Brazil without the necessary registrations, that it would require several years and more than $1 million for Biomet to obtain new registrations, and that Galindo would not permit the company to continue to use Prosintese's registrations without compensation.

13. Biomet International therefore agreed to a "settlement" with Galindo, pursuant to which Prosintese would retain the registrations necessary for Biomet to sell its products in Brazil. In order to preserve the fiction that Galindo and Prosintese had been "terminated," Boren suggested that four new companies related to Prosintese be formed, ostensibly by associates of Galindo, to act as Biomet's distributors (the "New Distributors"). Boren knew that Galindo would work directly with these new distributors, and intended as much. As part of the "settlement" with Galindo, Biomet agreed to provide the new distributors with $3 million in Biomet products, at no cost. Boren directed, supervised and implemented the termination of Prosintese and the implementation of the new distribution system, including the formation of the New Distributors. In-house counsel for Biomet participated in the negotiation and implementation of this agreement and arrangement, and approved it.

14. In May 2009, Biomet International entered into distribution agreements with the New Distributors. From 2009 until 2013, with the full knowledge and approval of Boren and Biomet counsel, Biomet used the New Distributors, in whose activities Galindo was directly involved, to sell its products in Brazil.

C. **Biomet Enters into a Deferred Prosecution Agreement, Falsely Representing to the United States Government That the Company Had Severed Ties with Galindo and Prosintese**

15. On March 26, 2012, Biomet and the United States Department of Justice ("DOJ") entered into a deferred prosecution agreement ("the 2012 DPA"), pursuant to which DOJ agreed to defer prosecution of a criminal information charging the company with five felonies, including violations of the FCPA based on improper payments made by the company to government-employed doctors in Argentina and Brazil. Pursuant to the 2012 DPA, Biomet agreed to pay a criminal penalty of $17,280,000, to cooperate with law enforcement authorities in investigating violations of the FCPA, to implement and maintain a corporate compliance program, to engage an independent corporate compliance monitor, and to make periodic reports to DOJ regarding its corporate compliance program.

16. In the 2012 DPA, Biomet admitted to having knowledge of Prosintese's payments to government-employed doctors in Brazil since at least 2001. Biomet also admitted that between 2001 and 2008, Biomet International had authorized the payment of more than $1,000,000, "some or all of which" was used to bribe Brazilian doctors.

17. Biomet's General Counsel, Brad Tandy, and two other attorneys representing the company, signed the 2012 DPA on behalf of the company, "stipulat[ing]" that it was "true and accurate."

18.     However, as Biomet – including Boren and others in the company – knew at the time the 2012 DPA was signed, Biomet's representation in the 2012 DPA that it had "terminated its relationship" with Galindo and Prosintese was false.  Biomet had knowingly and deliberately continued to sell its products in Brazil through Galindo and the New Distributors after its purported "termination" of Galindo and Prosintese in May 2008.  In fact, despite its knowing false representation in the 2012 DPA, Biomet continued to sell its products in Brazil through Galindo and the New Distributors after the company executed the 2012 DPA in March 2012.

**D.     Biomet's Breach of the 2012 Deferred Prosecution Agreement is Discovered, and Biomet Enters into a Second Deferred Prosecution Agreement.**

19.     When the United States learned of Biomet's breach of the 2012 DPA, it negotiated a second deferred prosecution agreement (the "2017 DPA"), with Defendant, which had acquired Biomet.  In the 2017 DPA, Defendant admitted that Biomet had breached the 2012 DPA by continuing to distribute Biomet products in Brazil through Galindo, and at least one of the New Distributors, after the May 2008 Termination Letter.

20.     In the 2017 DPA, DOJ agreed to defer prosecution of a superseding criminal information charging the company with violating the FCPA, in exchange for Defendant's payment of approximately $24 million in criminal fines, disgorgement, and interest, and Defendant's agreement to take additional remedial measures.

**E.     Biomet Falsely Blames Plaintiff for Its Breach of the Deferred Prosecution Agreement**

21.     As described above, when Biomet, realized that it would be unable to sell its products in Brazil if it in fact severed its relationship with Galindo and Prosintese, it hatched a plan to use the New Distributors to permit the company to continue to do

6

business with Galindo and Prosintese while appearing to have ended their relationship. To protect itself, Biomet, through Boren, determined to use Plaintiff as an unwitting dupe who could be blamed if this plan was exposed.

22. When Biomet purported to "terminate" Galindo and Prosintese as its Brazilian distributor in May 2008, Plaintiff was employed by Biomet as Managing Director of Biomet Argentina, SA. In that position, Plaintiff had had no involvement whatsoever in Biomet's operations in Brazil.

23. However, in September 2008 – as part of his plan to allow Biomet to continue to use Galindo and Prosintese as its Brazilian distributor, while preserving the fiction that it had "terminated" Galindo and Prosintese – Boren wrote Plaintiff to inform him that Plaintiff would be offered the position of Managing Director for South America, including Brazil, effective November 2008. And in November 2008, Boren wrote to Plaintiff, stating that Plaintiff would become Business Manager for South America, including Brazil, in January 2009.

24. However, despite his assignment of responsibility for Brazil to Plaintiff, Boren gave Plaintiff no information about the company's ongoing negotiations with Prosintese and Galindo. In a January 2009 email to Boren, Plaintiff specifically asked Boren for clarification regarding Prosintese's ongoing role in Brazil, asking whether Biomet could, or could not, sell its products to Prosintese. In his response, Boren did not tell Plaintiff that Biomet had severed its relationship with Galindo and Prosintese, or that Plaintiff, as the Biomet executive with responsibility for Brazil, should have no interaction with them. Instead, Boren simply stated that he would handle matters concerning Brazil, and that any future inquiries concerning Brazil should come to his (Boren's) attention.

25. Plaintiff understood, consistent with the Termination Letter, that Prosintese and Galindo were themselves prohibited from selling Biomet products in Brazil. However, Plaintiff was never told, by Boren or anyone else at Biomet, that Galindo and Prosintese were not to be involved with the New Distributors, or that he should have no contact with Galindo or Prosintese.  In fact, he was led to believe the opposite – that Biomet expected and intended that Galindo would be directly involved with the New Distributors.

26. Plaintiff also understood that Galindo and Prosintese held the registrations required to sell Biomet products in Brazil, and, consistent with Biomet's expectations and plans, that Galindo was involved in the New Distributors' importation and sale of Biomet products. Plaintiff therefore continued to interact with Galindo, as part of his responsibilities, with the knowledge and approval of his superiors and Biomet counsel.

27. Despite Plaintiff's position of responsibility for Biomet's Brazilian operations, Plaintiff was not consulted by the company in connection with the 2012 DPA.  In other words, although Biomet represented, in the 2012 DPA, that it had "terminated its relationship" with Galindo and Prosintese, no one asked Plaintiff if that statement was true.  Plaintiff was not consulted because, had Plaintiff been consulted, Plaintiff would have learned that the company was representing to the United States that Biomet had severed its relationship with Galindo and Prosintese, which Plaintiff knew was not true. Boren and Defendant knew that in that event, Plaintiff – who had gone to great lengths to expose and terminate FCPA violations by Biomet employees, persisting in that effort even when his efforts were ignored by superiors – would have taken action to prevent the company from making false representations in the 2012 DPA, by alerting company officials or, if necessary, United States government officials, to the false representation.

8

28.     When Biomet's breach of the 2012 DPA became known, the company dispatched an attorney to meet with Plaintiff.  In that meeting, Biomet's attorney accused Plaintiff of continuing to do business with Galindo following the Termination Letter, and of concealing this fact from his superiors.  Plaintiff explained that Boren had negotiated and established the new distribution system before Plaintiff assumed any responsibility for Biomet's Brazilian operations, and that Plaintiff was never instructed not to do business with Galindo or Prosintese – to the contrary, he was instructed by his superior, Boren, to continue to do business with them – and that his interactions with Galindo and Prosintese were approved by his superiors and Biomet counsel.  Because he was following his superior's instructions, with the approval of Biomet's counsel, Plaintiff did not believe that his interactions with Galindo and Prosintese were improper, and therefore did not conceal those interactions from Boren or anyone else at Biomet.  The 2017 DPA describes several occasions between the May 2, 2008, Termination Letter and the signing of the 2012 DPA on which Plaintiff explicitly informed his superiors of ongoing interactions with Galindo and Prosintese, and of the link between Galindo/Prosintese and the New Distributors.

29.     In April 2014, Biomet Argentina suspended Plaintiff from his employment, and Plaintiff's employment with Biomet ended in 2015.

**E.  Defendant Publishes False and Defamatory Statements Concerning Plaintiff**

30.     Biomet maintains a "Biomet Inc. Restricted Parties List" (the "Restricted Parties List"), containing the names of individuals and entities identified by Biomet as posing "significant and unacceptable" risks to the company's efforts to comply with  "the anti-corruption and anti-bribery laws in all countries in which Biomet operates."  Biomet

instructs recipients of the Restricted Parties List that:

> All Biomet employees, agents, third parties, and any individual or entity performing services for or on behalf of Biomet, anywhere in the world may not do business with any entity on the Restricted Parties List.

32. On October 24, 2014, Antje Petersen-Schmalnauer, Chief Compliance Officer, Vice President and General Counsel of Biomet Inc. sent an email, addressed to "CPWAR DueDiligence (Mailbox)" and others, which informed its readers, including persons outside Biomet, that Plaintiff had been placed on the Restricted Parties List because he posed a "significant and unacceptable" risk to the company's efforts to comply with "anti-corruption and anti-bribery laws." The email went on to instruct "[a]ll Biomet employees, agents, third parties, and any individual or entity performing services for or on behalf of Biomet," that they "may not do business with" Plaintiff.

33. The Restricted Parties List circulated with the October 24, 2014, email stated that Plaintiff had been placed on the Restricted Parties List "in connection with [Biomet's] corruption-related investigation involving Biomet Brazil." At the time this email was sent, it was widely known, within and without the company, that an internal investigation of corruption in Brazil had revealed that the company had violated the FCPA in Brazil for many years. It was further widely known, within and without the company, that Biomet had entered into a deferred prosecution agreement to avoid prosecution for this crime. Defendant's statement – that Plaintiff had engaged in this corrupt and criminal activity – was false, and defamatory *per se*.

34. At the time the October 24, 2014, email and Restricted Parties List were published, Defendant was aware that its statement that Plaintiff had engaged in improper activity was false, or acted in reckless disregard of that falsity.

10

35. Defendant has republished the Restricted Parties List on occasion since October 24, 2014, including a republication on May 16, 2016, continuing to identify Plaintiff as posing a risk to Biomet's efforts to comply with anti-bribery laws because of improper activity supposedly uncovered by the company's anti-corruption investigation in Brazil.  As described above, however, this was, and is, false.

36. On each occasion that it has published the Restricted Parties List since October 24, 2014, Defendant has acted with knowledge that its statement that Plaintiff engaged in improper activity was false, or in reckless disregard of that falsity.

37. Defendant's publication of this false statement concerning Plaintiff has effectively "blackballed" Plaintiff, making it impossible for him to secure employment.  In adddition to monetary damages, this has caused Plaintiff – who is 51 years old and has a wife and 3 children under age 21 – severe emotional distress.

## COUNT ONE: DEFAMATION

38. Plaintiff realleges and incorporates herein by reference each allegation set forth in ¶¶ 1-37, *supra*.

39. Defendant's statement in the October 24, 2014, email, and in publications made by Defendant thereafter, including the Restricted Parties List published by Defendant on May 16, 2016, that Plaintiff poses a risk to Biomet's efforts to comply with anti-bribery laws because of improper activity supposedly uncovered by the company's anti-corruption investigation in Brazil, was false, and defamed Plaintiff.

40. Defendant published this defamatory statement on October 24, 2014, May 16, 2016, and, on information and belief, on other occasions.

11

41. Each time Defendant published this defamatory statement, Defendant acted with malice, knowing that it was false, or with reckless disregard of its falsity.

42. Defendant's publication and republication of this defamatory statement has damaged Plaintiff's reputation for honesty, integrity, morality, and law-abidingness; exposed Plaintiff to harassment, public contempt, and ridicule; caused Plaintiff to lose professional stature; impaired his employment and earning opportunities for the rest of his life; and caused Plaintiff to suffer great pain and mental anguish.

WHEREFORE, Plaintiff demands judgment against Defendants for actual, general, special, and compensatory damages in an amount greater than $75,000 plus the costs of this action, including attorney's fees and such other relief deemed to be just and equitable; and further demands judgment against Defendants for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and the following relief:

A. That judgment be entered against Defendants for special damages, compensatory damages, and punitive damages in an an amount in excess of $75,000, exclusive of interest and costs;

B. That all costs of this action be assessed against Defendants, including all reasonable attorney's fees, costs, and expenses of this action; and

C. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues properly triable by jury in this action.

Dated:  1 May 2017			Respectfully submitted,


				_____/s/_____
				Paul F. Enzinna
				Ellerman Enzinna
				1050 W30th Street, NW
				Washington, DC 20007
				202.753.5553
				penzinna@ellermanenzinna.com

				*Counsel for Plaintiff Alejandro Yeatts*

CERTIFICATE OF SERVICE

    I certify that on 1 May 2017, a copy of the foregoing Amended Complaint was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.

                                    ____/s/_____
                                    Paul F. Enzinna
                                    Ellerman Enzinna, PLLC
                                    1050 30th Street, NW
                                    Washington, DC 20007
                                    202.753.5553
                                    penzinna@ellermanenzinna.com

                                    *Counsel for Plaintiff Alejandro Yeatts*