# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

|                              |     |                          |
| ---------------------------- | --- | ------------------------ |
| ALEJANDRO YEATTS,            | )   |                          |
|                              | )   |                          |
| Plaintiff,                   | )   |                          |
|                              | )   |                          |
| v.                           | )   | CASE NO. 3:16-CV-706-MGG |
|                              | )   |                          |
| ZIMMER BIOMET HOLDINGS, INC.,| )   |                          |
|                              | )   |                          |
| Defendant.                   | )   |                          |

## OPINION AND ORDER

This case arises from circumstances that put Plaintiff Alejandro Yeatts at the center of an investigation and criminal charges against his employer, Defendant, Zimmer Biomet Holdings, Inc.[1] ("Biomet") for violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1, *et seq.* Biomet is a global company that designs, manufactures, and sells a variety of medical devices. The criminal charges resulted in part from Biomet's business relationship with Prosintese, a Biomet distributor in Brazil owned by Sergio Galindo, that engaged in the practice of unlawfully bribing doctors. Biomet resolved the FCPA charges against it by entering two Deferred Prosecution Agreements ("DPAs") with the Department of Justice, Criminal Division, Fraud Section ("DOJ") in 2012 and 2017.

---

[1] Zimmer Biomet Holdings, Inc. was formed in 2015 when Zimmer Holdings, Inc. acquired a corporation that owned Biomet and its subsidiaries, including Biomet Argentina, SA and Biomet International, Ltd. operating in South America as relevant to this action.

In compliance with the 2012 DPA, Biomet instituted a Restricted Parties List ("RPL") that included the names of individuals and entities with which the company and its affiliates must not do business to avoid violating the FCPA. A cover e-mail accompanying the RPL, which was sent to company employees and Biomet's business partners, explained that the named entities posed risks to Biomet's efforts to comply with anti-corruption and anti-bribery laws, including the FCPA. Yeatts was included on the RPL with a notation stating that he had been "[s]uspended in connection with [a] corruption-related investigation involving Biomet Brazil." [DE 67-21 at 4]. Almost a year after Biomet published the RPL, Yeatts's employment was terminated and the parties entered a Settlement Agreement.

In October 2016, Yeatts initiated this lawsuit raising a defamation claim against Biomet for the statements made about him in the RPL and accompanying e-mail.[2] Yeatts has now filed a motion for partial summary judgment seeking resolution of certain elements his defamation claim but acknowledging that genuine disputes of material fact exist as to the falsity of Biomet's statements and the necessary elements of malice and damages. Biomet has filed its own motion for summary judgment arguing that no genuine disputes of material fact exist and that Yeatts failed to establish all the elements necessary to succeed on his defamation claim thus entitling Biomet to judgment as a matter of law. Both motions became ripe on October 23, 2018. This Court held oral

---

[2] Yeatts's claims for intentional infliction of emotional distress and negligent infliction of emotional distress were dismissed by this Court for failure to state a claim on April 17, 2017. [DE 23].

argument on December 13, 2018. The undersigned now issues the following opinion and order based upon the consent of the parties and 28 U.S.C. § 636(c).

## I.    RELEVANT BACKGROUND

A graduate of the University of Pennsylvania's Wharton School of Finance, Yeatts was employed by Biomet Argentina, SA, a subsidiary of Biomet, from 2005 through September 4, 2015. Initially, he served as Biomet Argentina's Managing Director. In December 2008, Wil Boren, President of Biomet International, Ltd., promoted him to the position of Business Manager for South America. In his new role, Yeatts was the most senior Biomet employee in the region and directly oversaw Biomet's operations in Brazil. Yeatts's responsibilities included implementation of Biomet's compliance policies.

Until 2008, Biomet International sold medical devices in Brazil under a distribution agreement with Prosintese, Sergio Galindo's company. Prosintese was Biomet's sole distributor of knee replacements, hip replacements, and arthroscopic devices. Biomet terminated Prosintese as its distributor in May 2008 after learning that Galindo had been bribing healthcare providers, conduct prohibited by the FCPA. Yeatts and other Biomet senior leaders were informed of Galindo's illegal bribes. Yeatts understood the gravity of Galindo's misconduct and its potentially damaging effect on Biomet due to his attendance at multiple FCPA training sessions relevant to his compliance duties in the Latin America region.

Biomet's business in Brazil, however, declined after terminating Prosintese and Galindo because Prosintese continued to own the government registrations for Biomet's

products in Brazil and new registrations could not be obtained quickly. Accordingly, Biomet entered into a "Private Instrument for Cancellation of Business Relationship" with Prosintese and Galindo on June 1, 2009 ("the 2009 Agreement"). Through the 2009 Agreement, Biomet and Prosintese deemed their business relationship, which had authorized Prosintese to import, store, promote, distribute, and market Biomet products in Brazil, terminated and cancelled. [DE 67-6 at 4, ¶ 2]. Prosintese and Galindo were also explicitly "prohibited from importing, storing, promoting, distributing or in any way marketing in Brazil the products made by Biomet . . . ." [DE 67-6 at 4, ¶ 3]. However, the 2009 Agreement limited Biomet, Prosintese, and Galindo to interaction related to the use and renewal of Prosintese's product registrations until new registrations could be procured. [DE 67-6 at 7–8, ¶¶ 18–24].

Among the distributors replacing Prosintese in Brazil was a company named Bio2, which engaged Galindo as a consultant. Accordingly, Biomet President Boren equated Bio2 with Galindo in a PowerPoint presentation shared with Yeatts and others. [DE 67-10 at 3]. Yeatts communicated with Galindo in his capacity as Bio2's consultant about product registrations, but also solicited Galindo's advice related to products, the market, and prices. [DE 67-1 at 9, 76:10–24]. Yeatts's contacts with Galindo included several in-person meetings between 2009 and 2014. [DE 67-1 at 13, 204:14–18]. The agenda for one of those meetings on June 27, 2010, shows that they anticipated discussing the loss of trust and credibility suffered by Biomet as the result of Prosintese's termination and Biomet's resulting departure from the Brazilian market as well as sales, marketing, and pricing. [DE 67-8 at 2]. Yeatts's interactions with Galindo

are also detailed in other communications to and from Yeatts between 2009 and 2014 that focused on control of Bio2 and pricing. [DE 67-9; DE 67-12].

Following an independent investigation by DOJ and its own investigation of FCPA compliance within the company, including Galindo's conduct in Brazil, Biomet entered its first DPA with DOJ on March 26, 2012 ("the 2012 DPA"). [DE 67-16]. The 2012 DPA assessed Biomet $17.28 million in penalties and required Biomet to "engage an independent corporate compliance monitor" ("the Monitor") to avoid criminal prosecution. [DE 67-16 at 7]. The 2012 DPA defined the Monitor's primary responsibility as assessing and monitoring Biomet's compliance with the DPA "to specifically address and reduce the risk of any recurrence of Biomet's misconduct."[DE 67-16 at 28]. The DPA also authorized the Monitor to investigate Biomet's compliance program and issue a report recommending improvements to the program. [DE 67-16 at 28–30]. The DPA required Biomet to "adopt all recommendations in the [Monitor's] report." [DE 67-16 at 30].

In October 2013, Biomet learned from an anonymous source that Galindo remained inappropriately involved in the operation of Biomet's new Brazilian distributors. In compliance with the 2012 DPA, Biomet informed the Monitor and DOJ about this information, which led to new and separate corruption-related investigations by both Biomet and DOJ. Yeatts was never interviewed as part of the investigations. However, his interactions with Galindo after the 2009 Agreement were considered, especially because of his central role in Biomet's South American operations. In April 2014, Yeatts was suspended from employment because of his interactions with Galindo.

Upon the Monitor's recommendation, Biomet instituted a Restricted Parties List ("RPL") on October 24, 2014. [DE 67-3 at 5, 10:5–7; DE 67-18 at 2, ¶ 4]. The Monitor had worked with a Biomet committee to determine which individuals and entities would be included on the RPL. [DE 67-3 at 9–10, 22:22–23:22]. The Monitor would not have approved the RPL without Yeatts's name being included as a restricted party due to concerns about how his conduct did impact, and could have affected, Biomet's compliance obligations. [DE 67-3 at 21, 361:11–14]. Biomet's Chief Compliance Officer, Vice President, and General Counsel, Antje Petersen-Schmalnauer, distributed the RPL by e-mail to Biomet employees and business partners in the relevant region. Petersen-Schmalnauer's cover e-mail stated:

> Biomet Inc. and its worldwide subsidiaries ("Biomet" or the "Company") are committed to complying with the anti-corruption and anti-bribery laws in all countries in which Biomet operates. In furtherance of that commitment, Biomet has identified several entities that pose significant and unacceptable compliance risks. The Company has placed these entities on a Restricted Parties List. All Biomet employees, agents, third parties and any individual or entity performing services for or on behalf of Biomet, anywhere in the world may not do business with any entity on the Restricted Parties List.

[DE 67-21 at 2]. The attached RPL included a listing for "Alejandro Yeatts (Biomet South America Managing Director and Biomet Argentina President)," which identified the source of his inclusion as "Brazil Investigation" and the description of the issue surrounding Yeatts as "Suspended in connection with corruption-related investigation involving Biomet Brazil." [DE 67-21 at 4].

On September 4, 2015, Yeatts was ultimately terminated from Biomet. The terms of Yeatts's departure were defined in a Settlement Agreement. Pursuant to the Settlement Agreement, Biomet paid Yeatts approximately $350,000 and Yeatts agreed

> that he accepts the offer made by [Biomet] and readjusts his claim to the total, single and final amount stated [above] on account of any and all items, and that he waives any other item to which he might be entitled based on the employment relationship held with [Biomet] and/or termination thereof as agreed hereunder. [Yeatts] further states that upon full payment of the offered amount any and all claims or rights which might have been derived from his employment relationship with [Biomet] and/or the termination thereof shall be finally settled. Accordingly, [Yeatts] shall have no claims against [Biomet] and/or any of its related, controlling, controlled or subsidiary entities, associated or continuing companies or entities, or their respective shareholders, directors, manager or officers.

[DE 67-17 at 23–24]. The Settlement Agreement was publicly filed in Argentina on September 4, 2015, and approved by an Argentinian court on September 30, 2015. [DE 67-17 at 2, ¶ 3].

In the meantime, Biomet's and DOJ's separate investigations concluded that Biomet had not complied with the 2012 DPA leading to additional criminal charges for violations of the internal control provisions of the FCPA. To resolve those charges, Biomet entered a second DPA in 2017 ("the 2017 DPA") and paid a monetary penalty of $17.3 million. Yeatts's communications and meetings with or about Galindo were identified in the 2017 DPA as improper conduct. [DE 67-22 at 32–34, ¶¶ 30–31, 33–34, 36]. The 2017 DPA continues to govern Biomet's activities to this day.

Yeatts initiated this defamation lawsuit on October 13, 2016. In the operative amended complaint, filed on May 1, 2017, Yeatts alleges that the RPL and Petersen-Schmalnauer's e-mail published on October 24, 2014, May 16, 2016, and possibly other dates included false and defamatory statements about Yeatts. Yeatts identifies the relevant statements as: "Plaintiff poses a risk to Biomet's efforts to comply with anti-bribery laws because of improper activity supposedly uncovered by the company's anti-corruption investigation in Brazil." [DE 24 at 11, ¶ 39].

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex*, 477 U.S. at 322–23; *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

**B.     Defamation**

"To establish defamation, a plaintiff must prove the following elements: (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 955–56 (Ind. App. 2014). A statement is defamatory if it tends "to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007). Under Indiana law, offensive statements may rise to the level of defamation in two ways: defamation *per se* or defamation *per quod*.

Defamation *per se* "arises when the language of a statement, without reference to extrinsic evidence, constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct." *Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010). "[I]f the words used are not defamatory in themselves, but become so only when understood in the context of extrinsic evidence, they are considered defamatory *per quod*." *Id.* "In actions for defamation *per se,* damages are presumed, but in actions for defamation *per quod,* a plaintiff must prove damages. *Id.*

"[D]efamation cases are highly fact-sensitive." *Wartell v. Lee*, 47 N.E.3d 381, 385 (Ind. Ct. App. 2015). Nevertheless, a defamation "defendant is entitled to summary judgment if the undisputed material facts negate at least one element of the required elements." *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co., Inc.*, Cause No. 1:08-CV-243, 2010 WL 2608342, at *2 (N.D. Ind. June 25, 2010) (citing *Shine v. Loomis*, 836 N.E.2d 952, 956 (Ind. Ct. App. 2005)).

### 1.    Defamatory Imputation

Yeatts contends that the RPL and accompanying cover e-mail constituted defamation *per se*. Arguably, the RPL on its own suggests that Yeatts engaged in misconduct in his profession or he would not have been "[s]uspended in connection with corruption-related investigation" as the RPL explicitly states. [*See* DE 67-21 at 4]. As such, this statement—if false—could harm Yeatts's professional reputation. *See Kelley*, 865 N.E.2d at 596. Similarly, the cover e-mail on its own could suggest criminal conduct by Yeatts as an individual on the RPL by stating that listed individuals had

been identified as posing "significant and unacceptable compliance risks" in Biomet's efforts to comply with anti-corruption and anti-bribery laws" (collectively "the Compliance Risk Statement"). Thus, Yeatts alleges that the RPL and the e-mail—separately and considered together—are defamatory *per se* because they falsely implicate him in improper, if not criminal, conduct in violation of the FCPA.

Biomet, on the other hand, argues that these statements cannot be defamatory at all, let alone defamatory *per se*, because they are not false. Indeed, truth is a total defense to any defamation claim. *See Collins v. Purdue Univ.*, 703 F. Supp. 2d 862, 875 (N.D. Ind. 2010); *see also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) ("if the gist of a defamatory statement is true, if in other words the statement is substantially true, error in detail is not actionable"). And here, Yeatts does not dispute the fact that he was suspended from Biomet in connection with a corruption-related investigation. Instead, he argues that he is not a compliance risk and his conduct was approved by Biomet through Boren and the company's general counsel. In response, Biomet argues that the Compliance Risk Statement cannot be false because it does not contain an "objectively verifiable fact" regarding Yeatts; rather, it is Biomet's opinion. *See Wartell*, 47 N.E.3d at 385. Moreover, Biomet contends that even if the Compliance Risk Statement is not an unverifiable opinion, it is true and therefore cannot be actionable as defamation.

To be actionable as defamation *per se*, an allegedly defamatory statement must contain "objectively verifiable fact" regarding the plaintiff. *Wartell*, 47 N.E.3d at 385 (citing *Meyer v. Beta Tau House Corp.*, 31 N.E.3d 501, 515 (Ind. Ct. App. 2015)). "If the speaker is merely expressing his subjective view, interpretation, or theory, then the

statement is not actionable." *Id.* (quoting *Meyer*, 31 N.E.3d at 515). "In an action for defamation *per se,* the words used must have defamatory imputation on their face [and the] circumstances in which the statements were made have no bearing on whether the statements constitute defamation per se." *Id.* (quoting *Big Wheel Rests., Inc. v. Bronstein*, 158 Ind. App. 422, 302 N.E.2d 876, 879 (1973)).

The Supreme Court explained the distinction between factual and opinion statements by comparing the hypothetical statements, "in my opinion John Jones is a liar" with a statement that "Jones shows his abysmal ignorance." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990). The Court identified the "liar" statement as defamatory because it implied the fact that Jones told a lie. *Id.* at 20. Yet the Court found the "abysmal ignorance" statement unactionable opinion because it does not contain a "provably false factual connotation." *Id.* Similarly, the Seventh Circuit found the statement "[plaintiff] is a very poor lawyer" unactionable because it did not convey a verifiable falsehood like the statement "[plaintiff] lost every case he has tried" would have. *Sullivan v. Conway*, 157 F.3d 1092, 1097 (7th Cir. 1998). In *Dugan*, the Indiana Supreme Court found statements by an employee's supervisor that she was "stealing time," working on a scheme with her boss to defraud the company, and stealing an air compressor from the company to constitute defamation *per se* because they imputed misconduct in the employee's profession. 929 N.E.2d at 187. The court reached this conclusion relying solely on the statements, without reference to any extrinsic evidence, while reasoning that the statements were not subjective opinion but objectively verifiable defamatory facts. *Wartell*, 47 N.E.3d at 387 (analyzing the *Dugan* decision).

Here, Biomet's Compliance Risk Statement is more akin to the "abysmal ignorance" or "very poor lawyer" opinions than the "liar" or "stealing time" factual statements cited above. Even assuming that Yeatts complied fully with all applicable laws, policies, and ethical guidelines, Biomet could reasonably determine, or reach the opinion, that Yeatts's interactions with Galindo that were arguably beyond the scope of the 2009 Agreement posed a compliance risk for the company. In fact, it would be reasonable for any company already subject to a DPA for FCPA violations to take a hypersensitive view of conduct approaching the line of misconduct under the FCPA as a compliance risk to avoid potential future violations.

The court's rationale in *Wynn v. Chanos*, 75 F. Supp. 3d 1228 (N.D. Cal. 2014) affirms this conclusion. In *Wynn*, the plaintiff and his company alleged that a manager of a private investment firm defamed them when speaking at a symposium and implying that they violated the FCPA. *Id.* at 1231–32. Specifically, the defendant stated that he was concerned about the risk of FCPA violations by investing his clients' money in the plaintiffs' business after some informal investigation into the business. *Id.* at 1232. The court found that the Risk Statement was not defamatory because it could not be false. *Id.* at 1236. The court reasoned that "even definitive proof that [the plaintiff] did not commit any acts in violation of the FCPA would not alter the tenor of [the defendant's] statements or render them false." *Id.* The court noted that "[i]t is completely possible for companies to comply entirely with the law and yet conduct business in a way that poses an investment risk." *Id.* Similarly, Yeatts could have been found to have complied fully with the FCPA, other laws, and even professional ethical

guidelines but still have posed a risk to Biomet through his ongoing interactions with Galindo that crept close to exceeding the scope of allowable interactions under the 2009 Agreement and the FCPA.

Nevertheless, Yeatts wants the Court to focus on what he believes are verifiable facts showing the falsity of the Compliance Risk Statement. For instance, Yeatts contends (1) that he was never told not to deal with Galindo; (2) that Biomet, through Boren and Biomet's general counsel, knew about and approved his interactions with Galindo; and (3) that he was made the "fall guy" for Biomet's allegedly knowing and intentional ongoing dealings with Galindo in violation of the 2012 DPA. These facts, even if proven, do not establish with certainty that Yeatts was or was not a compliance risk. Indeed, such facts could be relevant to any wrongful termination claim. However, they do not offer any insight into whether the Compliance Risk Statement can be verified. As such, the Compliance Risk Statement is an opinion that cannot be proven false. Therefore, it presents no defamatory imputation making the Statement inactionable despite Yeatts's arguments to the contrary.

### 2. Malice and the Qualified Privileges

Even if the Court could find a defamatory imputation in the Compliance Risk Statement, Yeatts cannot establish the necessary element of malice because Biomet's statement is protected by the qualified privilege of common interest. The qualified privilege of common interest "rebuts the element of malice implied by law for the making of a defamatory statement." *Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223, 1232 (Ind. App. 2005). The common interest privilege applies when a communication is

made in good faith, based on a legal, moral, or social duty if the communication is made to individuals or entities with a corresponding interest or duty. *Id.* at1233 (quoting *Schrader v. Eli Lilly & Co.*, 639 N.E.2d 258, 262 (Ind. 1994)). The common interest privilege protects "communications between employers and employees, business partners, members of fraternal organizations, creditors and credit agencies" among others. *Id.* Whether the common interest privilege protects a particular statement is a question of law, appropriate for resolution on a motion for summary judgment. *Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 924–25 (Ind. App. 2002).

To successfully assert a common interest privilege, the defendant must demonstrate (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner to the appropriate parties only. *Cortez*, 827 N.E.2d at 1232. To overcome the privilege, a plaintiff carries the burden to show a genuine dispute of material fact as to whether the privilege was abused because "(1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth." *Passmore v. Multi-Mgmt. Servs., Inc.*, 810 N.E.2d 1022, 1027 (Ind. 2004); *see also Webster v. City of Indianapolis*, No. 1:10-cv-1622-SEB-DML, 2012 WL 4467558, at *9 (S.D. Ind. Sept. 26, 2012).

Here, Yeatts's name was included on the RPL in good faith with no malice because the DOJ Compliance Monitor required Biomet to do so. The RPL also upheld Biomet's legitimate interest in complying with the Monitor's recommendations, the

2012 DPA, and the FCPA. The RPL provided limited information about Yeatts consistent with Biomet's own compliance interest. The RPL was a proper mechanism for its disclosure of compliance risks like Yeatts because of the Monitor's direction and standard use of such lists in the industry. Moreover, Biomet limited publication to relevant employees and external individuals and entities that worked with Biomet and share Biomet's legal interest in avoiding FCPA violations or the moral and social duty to avoid corruption.

Moreover, Yeatts has not established any genuine dispute of material fact as to whether Biomet abused the common interest privilege. First, the record confirms that the RPL's publication was motivated by the Monitor's recommendation, not any ill will on the part of Biomet. Even a dispute over Yeatts's allegations that Biomet knew he worked with Galindo at the direction of company leadership, knew he was not a compliance risk, or used him to cover up the company's own misconduct under the FCPA cannot overcome the power of the DOJ Monitor to motivate Biomet to act in any way, including publication of the RPL making any such disputes immaterial. The record also shows that the RPL was sent only to those who needed to know the identity of compliance risks—employees and business partners—and therefore was not published excessively. Yeatts's own admitted conduct of engaging in business with Galindo that exceeded the scope of the 2009 Agreement also shaped the Monitor's and Biomet's decision to include him on the RPL. Thus, Yeatts's allegations that Biomet made the Compliance Risk Statement without grounds of support are inconsistent with

the record before the Court. Without more, Yeatts has not rebutted the qualified privilege of common interest established by Biomet. *See Hammel*, 407 F.3d at 859.

Even if the common interest privilege did not apply here, the qualified privilege of public interest does. "Indiana courts have . . . recognized what section 598 of the Restatement (Second) of Torts (1977) calls a 'public interest privilege'." *Kelley*, 865 N.E.2d at 599. "[S]tatements made in good faith pursuant to investigation by police of a crime are made in the performance of a public duty and are privileged." *Id.* at 600 (internal quotation and citation omitted). This Indiana Supreme Court has also privileged communications to private citizens reporting criminal activity to law enforcement. *Id.* Such privilege is warranted "to enhance public safety by facilitating the investigation of suspected criminal activity." *Id.* The public interest privilege therefore supports "a public policy intended to encourage private citizens and victims not only to report crime, but also to assist law enforcement with investigating and apprehending individuals who engage in criminal activity." *Id.* at 601.

The privilege, however, is not without bounds. Like statements protected by the common interest privilege, a statement protected by the public interest privilege may be rebutted with evidence of abuse of the privilege. *Williams v. Tharp*, 914 N.E.2d 756, 763 (Ind. 2009) (citing *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992); *see also Passmore*, 810 N.E.2d at 1027. Plaintiff still has not presented evidence of ill will or excessive publication. Moreover, Plaintiff's allegations of Biomet's nefarious purposes through the RPL do not rise to the level "without belief or grounds for belief in the truth" of the matter published. The "no grounds for belief" standard is very broad. Indeed, it

requires "the absence of any discernable basis for the truth of the matter—that something is so obviously mistaken—[to constitute sufficient] circumstantial evidence of a reporting citizen's actual knowledge of falsity." *Id.* at 966 (applying principles set forth in *Bals*, 600 N.E.2d at 1356).

Here, the *Kelley* rationale for privileging communications to private citizens, as affirmed by *Williams*, applies. The RPL was published to identify potential risks to compliance with the FCPA and limit not only Biomet's risk of future violations, but to encourage the recipients of the List to comply with the law and avoid corruption-related behavior themselves. By publishing the RPL at the behest of law enforcement, Biomet also reported the listed entities, like Yeatts, and the RPL recipients to DOJ authorities. In other words, the RPL both served the public interest by incentivizing noncriminal behavior and identifying individuals and entities posing a risk for future criminal behavior. Moreover, Yeatts cannot overcome the fact that the Monitor directed Biomet to issue the RPL and to include Yeatts on it. This fact alone suffices as grounds for belief in the truth of the Compliance Risk Statement. *See Williams*, 914 N.E.2d at 766.

Accordingly, the qualified privileges of common interest and public interest apply to the RPL. With application of the qualified privileges, the element of malice in Yeatts's defamation claim cannot be established and Yeatts cannot succeed on his defamation claim. *See Shine*, 836 N.E.2d at 956. Therefore, Biomet is entitled to judgment as a matter of law.

### 3. Release of Claims through Settlement Agreement

Yeatts's Settlement Agreement included a release clause stating that he "shall have no claims against [Biomet] and/or any of its related, controlling, controlled or subsidiary entities, [etc.]." [DE 67-17 at 24]. However, the parties disputes whether this release of claims applies to the instant defamation claim.

Relying upon the opinion of an Argentinian lawyer expressed by affidavit, Yeatts argues that the Settlement Agreement was created and intended to be enforced under Argentine law. According to the Argentinian lawyer, Argentine law presumes no release of claims unless the specific claims are outlined in the agreement. Upon his own review of the Settlement Agreement, the lawyer concluded that it does not mention defamation and therefore Yeatts's defamation claim here was not released.

Biomet disagrees with Yeatts's interpretation and that of the Argentine lawyer. Regardless, Biomet impliedly asks the Court to strike the lawyer's affidavit from the record arguing that it constitutes inadmissible opinion evidence. In support, Biomet contends that the lawyer constitutes a retained expert who was not properly disclosed.

The potential release of claims is irrelevant here because Yeatts's defamation claim fails on the merits as discussed above. Therefore, any request to strike the lawyer's affidavit is moot.

### III.   CONCLUSION

Yeatts has not put forth evidence to establish any genuine disputes of material fact that overcome that Compliance Risk Statement challenged in this defamation claim is Biomet's opinion protected by the qualified privileges of common interest and public

interest. Therefore, Yeatts cannot establish the necessary elements of defamatory imputation and malice as discussed above. Therefore, the Court **GRANTS** Defendant's motion for summary judgment [DE 66] and **DENIES** Plaintiff's motion for partial summary judgment [DE 65]. The Court **DIRECTS** the Clerk to enter judgment in favor of Defendant.

      **SO ORDERED t**his 18th day of January 2019.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge
